JOHN G. CAMP, *vs.* W. D. MOSELEY, AND MARTHA ANN MANLY, AND HIRAM MANLY, IN RIGHT OF HIS WIFE, ADMINISTRATORS AND ADMINISTRATRIX, *de bonis non,* OF SAMUEL PARKHILL, DECEASED.

The officer will be protected in the execution of process emanating from a Court of general jurisdiction, provided it appears on the face of the process that the Court has jurisdiction of the *subject-matter.* The officer in such case need not show that there is a judgment, but may justify under the *writ* alone.

Where the *subject matter* of the suit is within the jurisdiction of the Court, but the want of jurisdiction is as to the person or place, unless the want of jurisdiction appear on the process to the officer who executes it, he is not a trespasser—contrary, when the *subject matter* is not within the jurisdiction of the Court.

The technicalities incident to estoppels are gradually giving way to considerations of reason and practical utility, and the Courts at the present day seem disposed to give force and efficacy to a doctrine which is based upon principles of justice and the purest morality.

Where one was present when a levy is made by the officer, and did not deny the right of the officer to make such levy, but furnished a list of property to be levied on, attended the sale and took an active part assisting the officer, advised bystanders to bid, and disapproved the forbidding of the sale by another: Held—that, although it appeared that such conduct was not fraudulently or wilfully intended to deceive the officer, the party so conducting himself is *estopped* from afterwards alleging that the officer was a trespasser.

The acts and admissions of one of several administrators, which amount to an *estoppel* against him, bind the whole.

The effect of an *estoppel,* whether legal or equitable, is the exclusion of evidence, and its existence must always be a question of law for the Court, and not of fact for the jury.

Writ of Error to Leon Circuit Court.

William D. Moseley and Martha Ann Manly, administrator and administratrix *de bonis non* of Samuel Parkhill, and Hiram Manly, in right of his wife, (said Martha,) administrator *de bonis non,* at the Spring Term (1846) of Leon Circuit Court, instituted an action of trespass against John G. Camp, for seizing a large number (180) of slaves.

The declaration alleged the slaves to be the property of the plain-

tiffs in their representative character—that they were seized and taken by defendant and by him detained for a long time, and that thereby the plaintiffs were hindered and prevented from cultivating and keeping in preservation three several plantations, and were deprived of the use and benefit of the slaves, and were prevented from enjoying the profits, benefits, and advantages of their labor and services, and were put to great expense in regaining the possession of the slaves.    The plaintiffs laid their damages at $50,000.

The defendant pleaded " not guilty," with privilege (by consent) to give in evidence under that plea the process on which he relied for justification.

At the trial Jabez B. Bull, Richard A. Shine, and David C. Wilson, three of the jurors so summoned as aforesaid good and lawful men were objected to by the plaintiffs' attorneys, for cause then and there shown, to wit: that the said Bull and the said Wilson were stockholders and directors in the Union Bank of Florida ; and the said Shine was objected to for cause, viz : that the said Shine was a purchaser at the sale of the property of Parkhill's estate, seized and sold under an execution issued in the suit of the Union Bank of Florida *vs.* Parkhill's administrators, which execution was in the hands of and sale made by John G. Camp, Marshal of Middle Florida, and under which defendant justified the alleged trespass.    These objections to the said jurors on behalf of the plaintiffs by their attorneys were sustained by the Court, to which decision and ruling of the Court the defendant by his counsel excepted.

The plaintiffs offered Benjamin W. Gause a witness, who proved that he was appraiser of the property of the estate of Samuel Parkhill, deceased, and appraised these negroes at the instance of plaintiffs in the fall of 1844, or spring of 1845, and the negroes afterwards went into the possession of plaintiffs.    Before the sale by the Marshal a part of the negroes were hired by plaintiffs to witness, and were delivered up to the Marshal, who informed him that he took them by a precept of the Court—estimates the value of the hires at $20 each—knows of sale by Marshal—and here the plaintiffs rested their case.

The defendant then offered in evidence a certain execution issued from the late Superior Court of Leon County, Territory of Florida, at the suit of the Union Bank *vs.* Hiram Manly and Martha Ann

Manly, administrators of Samuel Parkhill, deceased, which said writ of *fi. fa.* is in the words and figures following, to wit:

THE TERRITORY OF FLORIDA,

*To all and singular the Marshals of said Territory*—GREETING:

We command you that of the goods and chattels, slaves, lands, and tenements of Samuel Parkhill, deceased, in the hands of Martha Ann Manly, late Parkhill, and Hiram Manly, in right of his wife, said Martha Ann, administrators of Samuel Parkhill, deceased, remaining to be administered, you cause to be made the sum of ninety-four thousand one hundred and eighty-two dollars and twenty-two cents, its debt, and also twenty-seven thousand nine hundred and eighty-two dollars and sixty-five cents, its interest and damages, making together the sum of one hundred and twenty-two thousand one hundred and sixty-four dollars and eighty-seven cents, which the Union Bank of Florida lately, on the first day of March, 1845, recovered in our Superior Court for the County of Leon, in the Middle District, as well for its debt as its damages occasioned by the detention of said debt, and likewise the sum of seven dollars eighty-two cents, which to the said Union Bank of Florida in the same Court was adjudged for its costs by it in that behalf expended, together with lawful interest on said damages from the rendition of said judgment till paid, and the costs of this writ, and of your proceedings hereon, and that you have the said sums of money before the Judge of our said Court at Tallahassee, when satisfied, to render the said Union Bank of Florida the sums aforesaid; and have then and there this writ.

⌇ Seal of ⌇ Court. ⌇  Witness, Richard T. Birchett, Clerk of our said Court, at Tallahassee aforesaid, this 20th day of March, A. D., 1845, and of the Independence of the United States the sixty-ninth year.

R. T. BIRCHETT, *Clerk.*

[*Endorsed:*]—Came to hand 20th March, 1845, and levied on the following slaves: Tom Gandy, Harriet, Mary Ann and Wm. Washington, Sam Cormick, Primus, Sarah, George Edmondson, George Lewis, Daniel, William Eppes, Matilda Ann, Sarah and Maria, Julia, Anthony, Molly, Patsey, Hannah, Israel, Sarah and Harriet Ann, Kealan, Jacob, York, Melinda, Squire, Queen and Eliza Ann, Rhoda, Jack, Billy, Moses, Martha, Lucinda and William, Fenton and Helina, Frank, Francis, Isaac, Richard, Juba, Toney, Becky, Jinny, Cuffy, Phillis, Chloe, Dolly, Sam, Elizabeth,

Rachael, Adeline, Jane, Polly, John Robinson, Monachy, Elizabeth, Eddy, Bob, George, Maria Miles, Mary, Frederick, William Pryor, Louisa, William, Christina, Horace, Judy Linsey, Susan, Charley, Johnny, Mary Long, Joe, Ephraim, Ellen, Cornelia, Rachael, Jack Morgan, Mary, Toney, Sibby, William, Toney, Scipio, Peggy, Isaac, Lucy, York, Grace, Rose, Abram, James, Jones, George, York, Jr., Caroline, Morgianna, Fanny, Mary Page, Margaret, Phœbe, James, Juba, James, Frank, Margaret, Albert, Anderson, Pleasant, Edmund, David, William, Cæsar, Amy, Dick, Phillis, Richard, Israel, Ellick, Esther, Amy, Albert, Old Jack, Margaret, Homady, Pittman, Cary, James, Old Tom, Frederick Clark, Nancy Burney, John, Anna, Susan, Maria, Giles, Fanny, Martha, Ned, Francis, Barbary, Kitty Ann, Wilson, Nancy, Ben, Hercules, Hanly, Eliza, Jacob, Winney, Emily, Tom Hackley, Diana, Ellen, Amelia, Betsey Ann, Dick, Lisbon, Katy, Cyrus, Henry, Taylor, Mary Thomas, Louisa, Clarissa, Elizabeth, Anthony, Ben, Sam, Nancy Pool, Walker, Maria, Amy, Maria, Penny Davidson, George, Phil, Betty, Nelson, Silva, Matilda, Sarah Ann, Amelia, Wakala, Virginia, Charity.

JOHN G. CAMP, *Marshal.*

To the introduction of which evidence the plaintiffs objected, on the ground that they were strangers to it, and required the original entry and record of judgment to accompany it; which objection, on argument had, was sustained by the Court, and the defendant required to produce in evidence the said judgment; to which ruling of the Court the defendant, by his counsel, excepted. The defendant then offered in evidence other executions, which were in the hands of the Marshal at the time of the trespass complained of, and upon which like proceedings were had as on the one of the Union Bank *vs.* Parkhill's administrators, already given in evidence. The pleadings and proceedings in these cases were admitted by the parties to be similar to those in the case in which the above execution issued.

The defendant then proved by Wm. G. Ponder, a competent witness, that he was present at the sale of the Parkhill slaves, under the executions of the Union Bank and others, in the Spring of 1845. Moseley was present at the sale, and advised witness to purchase. Something being said as to title, Moseley said there would be no difficulty, he thought the title good; said that he had hired a certain negro, and that he thought he would suit witness. Witness sta-

John G. Camp, *vs.* W. D. Moseley and others.

ted that the general opinion was, that all difficulty arising out of litigation about the Parkhill estate was at an end ; that the judgment was legal, and there was no good objection to the sale of the property.

The defendant also proved by William Bloxham a competent witness, that he was present at the sale of the slaves. Had a conversation with Moseley the last night after the sale. Went with James T. Archer, Esq., to the room of Moseley. Archer said he was going to write to New Orleans to have the negroes sent there stopped. Witness told Moseley what Archer said about stopping the negroes, and Moseley said he would have nothing to do with it ; that he would not let them use his name. Moseley was at the sale; was acting there ; objected to only one negro woman being sold ; said she was replevied. Moseley bid at the sale for that negro, and run her up. When Colonel Gamble bid for any negroes, Manly asked witness to bid against him. Witness on cross examination, stated that Moseley observed, that the negro woman was replevied ; that a friend of his had wanted her, and he would make somebody pay for her, and he run her up to $800. All the negroes were not sold on the first day. This negro was sold after several others.— Witness got to the ground as Mr. Thompson got off the cotton bale. Moseley was there with a paper taking down the prices and names. As Col. Gamble had bid very often, people declined to bid. Moseley said to witness that was too little, and added, "Mr. Bloxham bid upon the negroes." Witness did so, and made them bring $1500 more.

The defendant also proved by Otis Fairbanks a competent witness, that he was present at the sale of the Parkhill slaves, in May, 1845. The negroes were selling low. Witness was on one side of a cotton bale, and Moseley on the other. Moseley said, "bid, I don't want the negroes sacrificed," and said he would be glad when they were off his hands. Cross examined, stated that Moseley did not call his name, his eyes passed around, and what he said was general to the whole crowd. There were many persons present.— The remark of Moseley was in a common conversational tone. Witness bid for one or two of the negroes, but none were knocked down to him. Heard Mr. Archer forbid the sale as illegal ; cannot state all the words he used ; heard but one sentence ; don't recollect on whose behalf he acted, but knew he was counsel for the estate.— Moseley was there. After he said, "bid, I don't want them sacrificed," the negroes sold better. Did not see Gov. Moseley there

when Archer made the announcement. Being re-examined, stated that, on reflection, he was satisfied that Moseley was present when Archer forbade the sale. He, (Moseley,) disapprobated Archer's act, and said he had better let them go; they never could go at a better time.

The defendant then proved by John G. Gamble, a competent witness, that he was present at a part of the sale; was not there when the first negroes were sold; saw Gov. Moseley there, had conversations with him on that day, and on the second day of sale. Gov. Moseley divided and arranged the negroes in lots; advised people to bid; said it was a good sale; he was glad of it; said his reason for separating the families, (which was contrary to the wish of witness,) was, that he was determined to make them bring as much as possible; said the sale was good, and he wanted to get rid of the business. Witness heard no dissent, none whatever, to the acts of the Marshal; no objection on the ground of illegality of sale; was not there when Mr. Archer dissented. Gov. Moseley did aid the Marshal in the sale. He divided the negroes; called them up in succession as they were sold. Moseley had a list; witness also had one; we were constantly conferring; Moseley designated the lots in which they should be sold; was present at the sale of negro Ellen; is uncertain whether it was on the first or second day. Moseley objected to the sale of Ellen, stating he had intended she should be replevied; that was the ground of his objection. All the negroes were mortgaged; two hundred for the stock debt; forty odd were mortgaged to secure accommodation paper; saw Manly at the sale; had no intercourse with him. Witness bid at the sale for negroes; did so as agent for Mr. Minetzhagen, by whom he was authorized to buy one hundred negroes for him; bought for him ninety.

The defendant proved by John George Anderson, a competent witness, that he was present at the sale; that he proposed to the Marshal, Major Camp, to give a certain sum for a family of negroes. Camp referred witness to Gov. Moseley, who on application replied that the negroes must be sold separately. The Marshal refused to take the responsibility of putting them up together, without the consent of Moseley, who declined acceding to request of witness.

The defendant proved by Thomas H. Hagner, a competent witness, that R. T. Birchett was Clerk of Leon Superior Court, and John G. Camp Marshal of Middle Florida, at the time the executions of the Union Bank, *vs.* Parkhill's administrators, issued.

John G. Camp, *vs.* W. D. Moseley and others.

That the list given in evidence, and referred to in the endorsement on the execution was the same identical one by which the negroes were sold by the Marshal, and the said list is admitted to be the one furnished the Marshal by Gov. Moseley.

The defendant then proved by Dr. John G. Gamble, a competent witness, that he was present at the sale of the Parkhill negroes, was there at the commencement, heard Mr. Archer forbid the sale *on the ground* that Mrs. Manly had not relinquished her dower in the slaves. L. A. Thompson, Esq., got up and said that had been adjudicated in the highest Court of the Territory, and that the sale was legal. M. A. Long and L. A. Thompson, competent witnesses, both depose that Mr. Archer forbade the sale only on behalf of the widow, as she claimed a right of dower in the slaves. The defendant then proved by R. T. Birchett that he was present at the sale, saw Moseley, Camp and Col. Gamble standing together conferring as, to the sale, and as to putting the negroes up in parcels. Witness said he was Clerk of the Superior Court of Leon County, and that Mr. Archer filed a bill for dower on the morning of the sale, in behalf of Mrs. Manly and said he did not expect the Court to grant it.— The defendant here closed his case.

The plaintiff then offered in evidence the record of the revocation of the letters of Martha Ann Manly as administratrix of Samuel Parkhill, deceased, in Leon County Court, dated the 18th March, 1844, in words and figures following, to wit:

At a Superior Court for the County of Leon, continued and held at the Court House in the City of Tallahassee, on Monday, the 18th day of March, A. D., 1844, present the Honorable Samuel J. Douglas, Judge. In the matter of the estate of Samuel Parkhill, deceased:

On an appeal from an order of the County Court of Leon County revoking the administration of Martha Ann Manly, late Martha Ann Parkhill:

This cause coming on to be heard anew upon the merits, and it appearing to the satisfaction of the Court that Henry Bond, Richard K. Call, George K. Walker and Benjamin W. Gause, the securities upon the official bond of said Martha, are insufficient: It is therefore ordered that the judgment and decree of the County Court be affirmed, and that the letters of administration heretofore granted to the said Martha be and remain revoked, annulled and set aside. It is further ordered that John G. Camp, Esq., Marshal of the District of Middle Florida, do take the property of the said estate of

23

Samuel Parkhill in his possession to remain there till the further or-
der and direction of this Court.

To which the defendant by his counsel objected on the ground
that defendant was no party to the proceeding then and there had,
and that it was not proper testimony to be taken into consideration
by the jury in maintenance of the issues joined on the part of plain-
tiffs, but the Court overruled the objection, and permitted the said
record and evidence to be read to the jury, to which decision and
ruling of the Court, the defendant by his counsel excepted.

And said plaintiffs also offered in evidence the record of the 21st
of March, 1844, appointing said John G. Gamble, Receiver, which
record is in the words and figures following, to wit:

At a Superior Court for Leon County, continued and held at the
Court House in the city of Tallahassee, on Thursday the 21st day of
March, A. D., 1844, present the Honorable Samuel J. Douglas,
Judge:   *In re*, Estate of Samuel Parkhill, deceased:

Ordered that John G. Gamble, Esq., of the county of Leon, be,
and he is hereby appointed receiver of the Estate of Samuel Park-
hill, late of Leon county, deceased, not administered by the late ad-
ministratrix, until the County Court of Leon county, shall appoint
an administrator *de bonis non*, upon said John G. Gamble's entering
into bond with two or more sufficient sureties, in the sum of one
hundred thousand dollars, conditioned for the faithful performance
of his duties as such Receiver, and to obey the orders of this Court
in that behalf, said bond to be approved by this Court, and it is further
ordered, that upon the approval of said bond by the Judge of this
Court, the Marshal of this District be and he is hereby ordered and
directed to deliver the possession of all the estate real and personal
now in his custody, unto the said John G. Gamble, as Receiver as
aforesaid and take his receipts therefor returning the same with his ac-
counts and charges to this Court to be audited as this Court shall direct.

To the reading of both of which records that of the 18th of March,
1844, and that of the 21st March, 1844, the defendant by his coun-
sel severally objected, on the ground that it was not proper testimo-
ny to be read or to be taken into consideration by the jury in main-
tenance of the issues joined on the part of the plaintiff, but the Court
overruled the said several objections and permitted the said records
of the 18th of March, 1844, and the 21st of March, 1844, to be
read to the jury, to which decision and ruling of the Court the de-
fendant by his counsel excepted.

John G. Camp, *vs.* W. D. Moseley and others.

The plaintiffs further offered in evidence the written pleadings in the cause in which the Union Bank of Florida was plaintiff and Hiram Manly and Martha Ann Manly, administrators of Samuel Parkhill, deceased, were defendants, to which the defendant by his counsel objected as improper evidence to be read to the jury, or to be taken into consideration by them in maintenance of the issues joined by the plaintiffs, but the Court overruled the objection and permitted the said pleadings to be read to the jury, to which decision and ruling of the Court the defendant by his counsel excepted.

The plaintiffs then offered in evidence the record of the reversal of the judgment in the suit of the Union Bank of Florida plaintiff, and Hiram Manly and Martha Ann Manly, administrators of Samuel Parkhill, deceased, defendants, on which judgment the execution offered in evidence by the defendant, was issued, to which the defendant by his counsel objected : 1st, because he was not a party thereto ; 2d, because the reversal of the said judgment by the Supreme Court was subsequent to the trespass complained of ; and lastly, because it was not proper testimony to be read to, or taken into consideration by the jury in maintenance of the issues joined on the part of the plaintiff ; but the Court overruled the objection and permitted the said record to be read to the jury, to which decision and ruling of the Court the defendant by his counsel excepted.

The plaintiffs then offered in evidence a bill in Chancery, filed 10th April, 1845, [and praying an injunction against the sale, with the endorsement of a refusal by the Court to grant the prayer,] in which William D. Moseley and his securities on his official bond, as administrator *de bonis non* of said Parkhill, deceased, were complainants, and John G. Camp, the defendant, in this action, and others, were defendants, to which the defendant by his counsel objected, unless it was also shewn that subpœna had issued and was served on this defendant, and also because it was not proper testimony to be read to, or considered by the jury in maintenance of the issues joined by the plaintiffs in this action ; but the Court over-ruled the objection and permitted the said bill to be read to the jury, at which decision and ruling of the Court the defendant by his counsel excepted.

The plaintiffs then offered in evidence the stock mortgages given by Samuel Parkhill in his life time to the Union Bank of Florida, to show that the slaves levied on were mortgaged to said Bank, that the mortgages were not yet due, that the administrators of

Parkhill as representatives of the Estate, were Trustees for the bond-holders and general creditors, and entitled to the possession of the negro slaves levied on and sold, until the mortgages should fall due, and that the said mortgages were on record and notice to all the world, and that under the charter of the Union Bank the property thus mortgaged could not be sold.    To this evidence the defendant by his counsel objected, as not proper to be read or to be taken into consideration by the jury, in maintenance of the issues joined on the part of the plaintiffs, but the Court over-ruled the objection, and permitted the same to go to the jury ; to which decision and ruling of the Court the defendant by his counsel excepted.

The defendant to rebut this evidence on the part of the plaintiffs, offered John G. Gamble a competent witness, who proved that the mortgages were given for stock subscribed for, by Samuel Parkhill in his life time ; that the note sued on, and in judgment, was for money borrowed on the pledge of that stock : that the note given by said Parkhill for the money so borrowed, called a stock note, was overdue and the interest thereon for a long time unpaid, and was unpaid up to the time of suit instituted and judgment recovered : at the time of the sale the Union Bank of Florida had deposited with the Clerk of Leon Superior Court by order of the Judge thereof, Territorial Bonds in amount equal to the amount and sum for which the slaves were originally mortgaged, subject to the order of the Governor of Florida.

The plaintiffs then offered James T. Archer as a witness, who said he would hardly venture to speak with certainty, of what took place at the sale in May 1845, after what had been testified on the other side.    But from the following *facts* he believes he did forbid the sale as illegal.

When the judgment under which the sale was made was rendered against the original administrators, there was a large number of suits pending at the same time.    Witness as attorney for the estate deemed the judgment invalid and void and having it in view to contest proceedings under it, he suggested that all the suits should be placed in judgment by agreement on like pleadings and subject to all exceptions.    This was acquiesced in as the records will show.  After the levy witness in furtherance of his views presented the bill (referred to as filed 10th April, 1845,) in behalf of Moseley and his sureties, praying an injunction against the plaintiffs in execution and the marshal.    The application was refused.    Afterwards on the

John G. Camp, *vs.* W. D. Moseley and others.

morning of the sale the witness presented a bill in open Court in behalf of Mrs. Manly stating her dower interest in the slaves and praying an injunction against the sale of that interest. Witness stated at the time of this last application, that this bill raised the same question as the one previously presented, that he did not expect the order to be granted, but that he made the application, that purchasers might know that their titles would be disputed.

Immediately after this witness wrote in the marshals office a written protest against the sale and handed it to Manly to read before the bystanders. Manly said, witness had better make it himself.—Witness did undertake this duty. He was somewhat excited.—Knows he did object to the sale on the point of dower, and believes from his previous course, views and intentions that he stated and gave notice that the sale was illegal and that purchasers would bid at their peril.

Witness recollects that Mr. Thompson referred to the decision of the Court of Appeals and guarantied the sale to be valid ; according to the best of his recollection Governor Moseley was not present when he forbid the sale ; does not recollect whether he did order subpœna on the bill shewn in evidence. In reference to coversation between Moseley and Bloxham and witness, he told Bloxham that he understood he had purchased some of the negroes, and that he (witness) would pursue them ; is satisfied that the Governor never did in his presence say "his name should not be used in the proceeding against these negroes ;" knows but few of the negroes ; knows that plaintiffs have not got them.

This was all the testimony offered.

After argument of counsel on both sides, the Court delivered to the jury the following charge and instructions, viz : The letters of administration to Manly and wife having been revoked, the Court had no power to give any judgment binding on the estate. The judgment set up in this case was a nullity. That though it is the general rule, that the officer executing process issued-from a Court of general jurisdiction is not bound to enquire into the regularity of the proceedings, and may justify under the execution, yet the exception arises in this case from the fact of the personal knowledge of the Marshal proved, that he knew and had notice that Manly and wife were not the administrators, and this prevents him from justifying under the execution. Yet conceding that he might justify under the execution, if he had taken the property of the

John G. Camp, *vs.* W. D. Moseley and others.

defendants to the execution, does that justify him in levying upon property of the estate of Samuel Parkhill, in the hands of the admintstrators *de bonis non,* the plaintiffs in this action ? ・ The Court thinks it does not.   He was not commanded to disturb property in their hands.   It is contended that the Marshal should have been informed by plaintiffs if their property became mingled with that of the defendants in execution.   The Court thinks this case cannot ﹀ arise.  If the Sheriff takes the goods of the wrong party, even though he have the same name, he is liable : it is the duty of the officer to ascertain the truth.

In reference to the admissions of Moseley and Manly, the Court admitted the evidence in all its extent, for benefit of defendant.   The question, however, arises, as to the effect, weight, and sufficiency of this evidence.   The act complained of is a trespass : if Moseley or these parties did any thing to induce the Marshal to commit this trespass, to lead him to make the levy, (for that is the trespass,) the plaintiffs could not complain.   Did the Marshal go there to make the levy under this process, or did he do it at the instance of Moseley ?   But again, if a trespass was committed by the levy, the question is, have they waived it on the day of sale or previously ?   Was the delivery of the list a waiver ?   The position of the parties is to be considered.   They might have given embarrassment to the officer, or not being able to resist, they might give him facility to complete the act.   It is for the jury to inquire, if this would be a waiver of the trespass.   Now as to the proceedings on the day of sale. Whether this sale was then assented to, would appear to be a question more specially for the purchasers.   Were the plaintiffs bound to embarrass that proceeding ?   If you think they waived the trespass, it is for you to determine ; if so, you would find for the defendant.   If, however, the remarks made were mere statements, not to mislead Camp, not to induce him to act, then it is no waiver.— This is a question for you.   The Court then read to the jury the law as laid down by Judge Baldwin, Sedwick on Dam. p. 550, taken from 1 Bald. 138, as to the rule of damages in trespass, and added as the effect of the law, that the jury should put the plaintiffs where they stood as near as possible, not taking into consideration the value of the property, for which plaintiffs do not contend, but only the injury.

The Judge here closed his charge, and the defendant, by his counsel, asked the following instructions to the Jury :

1. That where the Court has jurisdiction of the subject matter it is sufficient to justify the officer executing its process, and the officer is not bound to examine into the validity of its proceedings, or the regularity of its process.

2. That if the subject matter of the suit is within the jurisdiction of a Court of general jurisdiction, but there is a want of jurisdiction as to the person, the officer who executes process in such suit is not a trespasser, unless the want of jurisdiction appears by such process.

3. That where the Court has jurisdiction of the cause, and the process is regular on its face, the officer who levies the same is justified in such levy.

*Mem.*—The instructions numbered 1, 2, 3, were given by the Court as the general rule, with the qualification, that in this case the defendant, having been a party to these proceedings, must be held cognizant of the irregularity of the process.

4. That the plaintiff in the suit on which this execution issued being the mortgagee of the slaves levied on, the Marshal who proceeded at the request of the said mortgagee in whom the legal title was, is no trespasser for the levy and seizure under said execution.

5. If the jury shall believe from the evidence that William D. Moseley, one of the plaintiffs in this action, aided the Marshal, by giving him information, furnishing a list to enable said Marshal to make the levy, by assisting said Marshal on the day of sale, by encouraging persons to bid for and purchase the slaves levied on, then the said Moseley is estopped by said acts from setting up this trespass, and cannot maintain this action.

6. If the jury shall believe, from the evidence, that William D. Moseley neglected to forbid the sale of the slaves levied on, that he failed to warn the Marshal that he had levied on property to which he, Moseley, had a claim and right of possession, then such silence must be looked on as an acquiescence by said Moseley, in the acts of the officer, and he is thereby estopped and precluded from maintaining this action.

7. That a valid judgment binding the estate of a decedent may be rendered against an executor sued as administrator, or *vice versa,* unless the difference of official character be pleaded in abatement, and that when rendered against an administrator as such who is in fact executor, or against a defendant executor who is in fact administrator, yet that the judgment in either case is valid against the estate, it is binding on the estate, and may be satisfied out of it.

8. That if under any state of things a proceeding under execution on the judgment rendered was allowable, the Court would assume that such a state of things did exist for the officers protection, or at least he should not be required to judge whether it did or not.

Which said instructions, numbers 4, 5, 6, 7, 8, the Court refused to give to the jury, which refusal of the Court, and to the qualification of the 1, 2 and 3 instructions prayed, and to the several points herein before excepted to, and to the charge of the Court, and the points therein ruled, the defendant by his counsel excepts, and prays this his bill of exceptions may be sealed and signed by the Judge, and made a part of the record.

THOMAS BALTZELL, [SEAL.]
Judge.

The Plaintiff in Error now seeks to reverse the judgment below upon the following assignment of errors.

1. The Court below erred in sustaining the objections to Jabez B. Bull, Richard A. Shine, and David C. Wilson, as proper, lawful, and qualified jurors to sit in this case in the Court below.

2. The Court erred in refusing to permit the execution of the Union Bank *vs.* Hiram Manly and Martha Ann Manly, administrators of Samuel Parkhill, deceased, to be read to the Jury, unless accompanied with the original entry and record of judgment.

3. In permitting the plaintiffs in the Court below to read in evidence to the jury the records of the 18th March, 1844, and the 21st March, 1844.

4. In permitting the plaintiffs to read as evidence to the jury the written pleadings in the cause in which the Union Bank of Florida was plaintiff, and Hiram Manly and Martha Ann Manly, administrators of Samuel Parkhill, deceased, were defendants, and in overruling the defendants objection to the introduction of said written pleadings as proper evidence.

5. In permitting the plaintiffs to read as evidence to the Jury the record of the reversal by the Supreme Court of Florida, of the judgment in the suit of the Union Bank of Florida, plaintiff, and Hiram Manly and Martha Ann Manly, administrators of Samuel Parkhill, deceased, defendants, and in overruling the objections to the introduction of said evidence.

6. In permitting the plaintiffs in the Court below to read in evidence to the Jury the Bill in Chancery filed 10th May, 1845, and in over-

ruling the defendant's objection to the introduction of said Bill in Chancery as evidence in the case.

7. In permitting the plaintiffs to read in evidence to the jury the mortgages executed by Samuel Parkhill in his life time, to the Union Bank of Florida, and in overruling the defendant's objection to the introduction of said mortgages as evidence in this case.

8. The Court erred in its charge to the Jury in arguing and deciding the facts, which it is alone the province and duty of the jury to determine.

9. In refusing the 1, 2, and 3 Instructions as prayed by the defendant's counsel, and in adding to the said instructions the qualification as set forth in the memorandum.

10. In refusing the 4th Instruction asked for by defendant's counsel.

11. In refusing the 5th Instruction prayed for by defendant's counsel.

12. In refusing the 6th Instruction prayed for by defendant's counsel.

13. In refusing the 7th Instruction asked for by defendant's counsel.

14. In refusing the 8th Instruction asked for by defendant's counsel.

*Douglas & Hogue,* for Plaintiff in Error :

I. Under the first error assigned the plaintiff's counsel will contend :—

1. That he was entitled to a jury selected, summoned, and returned, according to law ; and only such objections could be made and sustained to individual jurors as are recognized by the common law or the statute laws of Florida.

2. That the objections made to the jurors, Bull, Shine, and Wilson are not such as the common law, or the statute laws of Florida recognize ; *vide* Thomp. Dig., 344.   3 Black. Com., Marginal page 362.

3. *Infamy* and *interest* are the only objections at common law that the Court can decide upon.   If the objection be to the favor it must be tried by *triers.*

4. It is no answer to the objection to say the defendant in the Court below had a jury and a fair trial. The law secures to the parties

24

a jury selected and empanneled after certain rules and formalities, and the best guarantee for fairness and impartiality is to observe the provisions and requisitions of the law and it is *error* to depart from them.   2 Va. cases, 307.

5. Any departure from the mode pointed out and prescribed by law, for the selection and empanneling of a jury, leaves the matter entirely at the discretion of the Court, and is a virtual repeal of the law and the Constitution.

II.  Under the 2d error assigned the plaintiff's counsel contend :—

1. That the execution under and by *virtue of* which the Marshal made the levy in this case, having issued from a Court of general jurisdiction, he was not bound to look into the validity of the judgment, or the regularity of the proceedings.   He might justify under his writ, and was not required to show an unreversed judgment.— Barker *vs.* Braham and Norwood, 3 Wilson Rep. 375—345.   *Gott vs.* Mitchel, 7 Blackford Rep. 270.   5 Hayward 142.   1 Carr. and Payne, 7.   10 John. Rep. 138.   7 Law Lib. 53.

2. If it is replied that the administrators *de bonis non* are *strangers* and therefore it is necessary to show a judgment, it is answered :— 1. That the privity which exists between general administrators and administrators *de bonis non*, precludes the idea of their being stran‐ gers.   8 Cowen 339—343.   2. To entitle them to the benefit of this argument, they must at the time of the levy, have been wholly *estranged* from the estate.   Granwell *vs.* Sibley, Levintz part 2, page 190.   3. That all suits against administrators and executors are virtu‐ ally proceedings against the estate of their intestate or testator to be administered.   The estate is a fund designated by law for the pay‐ ment of debts, and a judgment binds the estate until reversed, the decedent if alive could not complain if his *property* was taken on an erroneous judgment, and there is no good reason known to the law why his personal representative should be in a better condition . Parker *vs.* Amys, Lev. 26.   1 Kelly's Rep. 82.

3. Manly and wife cannot set up this defence as the judgment was against them in their representative characters, and the decis‐ ion of the Court overruling their plea of discharge in the former suit, was error of the Court for which the Marshal cannot be made responsible.   10 Peters 476.   6 Peters S. C. Rep. 16, 17.

4. Moseley having united with Manly and wife (against whom the execution was regular) can have no better claim to maintain this action than his co-plaintiffs.

John G. Camp, vs. W. D. Moseley and others.

III. Under the third error assigned the plaintiffs counsel will contend :—

1. That the records of the 18th and 21st of March, 1844, which were given in evidence on the trial below were *res inter alias actor*, the Marshal only acting as the custodiar of the Court until a proper and fit person could be appointed as the representative of the estate.

2. Any knowledge he might thus obtain of the situation of the parties, he could not set up in opposition to the mandate of his writ.

3. Notwithstanding their dismissal from the estate, they may have been remitted to their former rights or have retained for the purpose of satisfying this very demand.   7 Blackford 290.   3 Wilson 345, 376.

IV. Under the fourth error assigned the plaintiff's counsel will contend :—

1. That the written pleadings in the case were *res inter alias actor*, the officer was not bound to enquire into the regularity of the proceedings, he was only bound to look to the mandate of the writ. 9 Peters Rep. 624.   3 Wilson Rep. 345, 376.   7 Blackford Rep. 270.

2. If the officer is required to judge of the regularity of the proceedings, to pass upon the ruling, and the decisions of the Court ; the effect will be to make the officer an appellate Court, and the Supreme Court would be in no better condition in this respect than the inferior Courts, and their decrees might have to undergo the like scrutiny ;—nothing is better settled than where an officer is required to judge he is not liable for an error of judgment.

V. Under the fifth error assigned the plaintiff's counsel will contend :—

1. That the proceedings had in the Supreme Court in relation to the reversal of the judgment of the Union Bank *vs.* Parkhill's administrators were *res inter alias actor.*

2. That the reversal of the judgment was subsequent to the acts of the Marshal complained of as a trespass, and that said subsequent reversal does not render void those acts which were done un der it while it remained unreversed.   Ives *vs.* Lucas, 1 Carr. and Payne 7.   7 Blackfords Rep. 270.   3 Wilson Rep., 345, 376.   6 Peters S. C. Reps. 16, 17.

VI. Under the sixth error assigned the plaintiff's counsel will contend :—

1. That the filing of the Bill in Chancery, by Moseley and his securities was no notice to the Marshal unless service of subpœna was also proved.

2. That if the Marshal had notice of the filing of the bill, and the refusal of the Court to grant the injunction, it was an additional reason why he should proceed with the levy.

3. That the evidence has no *tendency* to prove the trespass, which was the issue joined, and was therefore improperly received by the Court upon the trial in the Court below. Its effect was to embarrass the jury.

VII. Under the seventh error assigned the plaintiff's counsel will contend :—

1. That the stock note being due, and the interest thereon remaining unpaid, the slaves mortgaged were liable to seizure and sale under a judgment and execution on said stock note.

2. That a failure to pay up the interest and renew the stock note was a forfeiture of the mortgage and a breach of its conditions as contemplated by the charter of the Bank, and the receiving the mortgages in evidence to prove the Marshal a trespasser by levying on mortgaged property was error, vide the opinion of the Court of Appeals in the case of the Bank *vs.* Brown, and the Bank *vs.* Chapman.

VIII. Under the eighth error assigned the Plaintiff's counsel refers to the opinion of the Court below as set forth in the bill of exceptions.

IX. Under the ninth error assigned the Plaintiff's counsel will contend :—

1. That the instructions numbered 1, 2, and 3, should have been given by the Court below as prayed by the defendant's counsel.

2. That the qualification added to them by the Court was not such as the law recognizes.

3. That the only distinction made by the law is in those cases in which the execution issues from a Court of *limited* jurisdiction, and *when* from a Court of *general* jurisdiction.

4. That the qualification set forth in the memorandum, did not apply as the Marshal was no *party to the proceedings*, and to test which he could not maintain an appeal or writ of error to reverse them. On these points see Jaques *vs.* Cesar, 2 Saund. Rep., 101, (y) note 2, 15 John. Rep., 155. 12 John. Rep., 267. 3 Wilson Rep., 345, 376. 2 Wilson Rep., 384. 7 Blackford Rep., 270. 5 Wend.

172. 10 John. Rep., 138. 9 do., 229. Strange 509, 700. Bul-
ler's *Nisi Prius*, 83. 2 Term Rep., 653. 6 Peters S. C. Rep.,
709. 2 Peters S. C. Rep., 169. 3 Howard S. C. Rep., 762. 2
Howard's S. C. Rep., 343. 10 Peters S. C. Rep., 473.

X. Under the tenth error assigned the plaintiff's counsel will
contend :—

That the mortgages having become forfeited by the non-payment
of interest, and the failure to renew the stock bond, the mortgagee
was entitled to enter and take possession of the slaves, and the Mar-
shal who took possession of the slaves by virtue of an execution in
favor of the mortgagee, and with consent of said mortgagee, was no
trespasser, see the case of Hawkins and Philips decided at the last
term of the Supreme Court.

XI. Under the eleventh error assigned the plaintiff's counsel will
contend :—

1. That the acts of Moseley on the day of sale, and previous to
the levy, as disclosed by the bill of exceptions taken on the trial,
operates as an estoppel " *in pais,*" and precludes his setting up the
acts of the Marshal as a trespasser.

2. That if Moseley be, as it is contended he was, a *stranger* to
the proceedings under the execution, then his acts render him a joint
trespasser with Camp, and he cannot maintain this action. 3 Wil-
son, 377.

3. The acts of Moseley ratified the acts of Camp, his assent
thereto was equivalent to a command to commit them. 2 Saund.
Plea and Ev., Marginal page 865. 1 Forb. Eq. Book 1, Ch. 3, sec.
4. Story's Eq., page 387, note 4. 19 Wend. 557. Smith's Lead-
ing Cases on Estoppel " *in pais,*" 554. 2 Murpheys Rep., 6.

XII. Under the twelth error assigned the plaintiff's counsel will
contend :—

1. That the failure of Moseley to forbid the sale of the slaves
levied on by the Marshal, to warn the Marshal that he had levied on
property to which he, Moseley, had a claim and right of possession,
operates as an estoppel " *in pais,*" and he cannot maintain this ac-
tion.

2. That a levy on the property of an intestate in the hands of his
representative is unlike a levy on the property of a *stranger*. The
judgment in the former case is against the estate, and to be satisfied
out of it. It is a seizure and sale of A's property to pay A's debt.
In the case of a stranger it is applying his property to pay the debt

of another.   5 New Hamp., 364.   1 do: 87.   3 Harr. Dig., 6115.
- 1 Term Rep., 475.

3. That the powers and rights of co-administrators over the estate of their intestate being like that of co-executors, one may release or discharge a debt against the express dissent of the other.   So also · may the property of the intestate be taken if found in the hands of either to satisfy a debt of the estate.   In this case the judgment was against two of the co-administrators, and it was no trespass to take the property if found in the hands of either administrator.— The execution *was regular as to* Manly and wife, they therefore cannot maintain this action.   Moseley by his acts is estopped and he cannot maintain it.   1 Wendell, 583.   1 McCord, 492.   Toller on Executors, 408.   11 John. Rep., 22.

XIII. Under the thirteenth error assigned the plaintiff's counsel refers the Court to Parker *vs.* Amys, Levintz 261.   Granville *vs.* Sibley, Levintz, part 11, page 190.

XIV. Under the fourteenth error   assigned the plaintiff's counsel will contend :—

1. That the Marshal had no right to decide whether the judgment was rendered against Manly and wife on  their old grant of administration,  or as  administrators *de bonis non.*   That as a valid judgment might have been rendered, and one binding on the estate, had they been sued as administrators, without the joinder of Moseley or the description " *de bonis non,*" it is sufficient for his protection, and he is not required to judge whether such a  state of things did  exist or not.   5 Wendell, 170.   Levintz 261.   The case of the Marshalsea Coke's Rep., part 10.   9 John. Rep., 229.   10 John. Rep., 138.

*Lastly,* It may be contended that the Supreme Court of Florida has already decided this judgment to be void, *an utter nullity.*   To which we answer :

1. That it was not necessary to  the decision of the cause  before the Court.

2. That the parties themselves did not *elect* so to consider it, otherwise they would have moved to vacate it in the Court below, that being the appropriate remedy to set aside a void judgment.

3. That a judgment may  be absolutely *void* as to the  *parties* to the action,′ yet not so in regard to the *acts* of the officer done under it, as in the cases in 7 Blackford and 3 Wilson.   In these cases the Court say,  " though there be no judgment the officer is protected by his writ."   In the case of Simms and  Wise *vs.* Slacum,  the Sup.

Ct. U. S. say, "that a judgment obtained by *fraud* will protect the officer for acts performed under it, though not the parties." 1 Cond. Sp. Ct. Rep., 541.

HAWKINS, J., delivered the following opinion:

The administrators *de bonis non* of Parkhill brought this action of trespass *vi et armis* in the Court below against Camp for seizing, taking, and leading away divers negro slaves, a hundred and eighty in number, the property of the said administrators. They allege in their declaration, besides the trespass, that these slaves were detained and kept by Camp for a long time, whereby great damage accrued to the plaintiff by the deprivation of their services, &c.— The defendant, Camp, pleaded the general issue, and justified himself for the alleged trespass, contending that he had taken the negroes by virtue and force of an execution issued from the late Superior Court of Leon County, at the suit of the Union Bank *vs.* Hiram Manly and wife, administrators of Samuel Parkhill, deceased.

The plaintiff proved by B. W. Gause, that he, Gause, had acted as appraiser of the property of the estate of Parkhill, and had appraised the negroes taken by Camp at the instance of the plaintiffs. in 1844 or 1845, and that the negroes afterwards went into possession of plaintiff. Before the sale by the Marshal Camp, a part of the negroes were hired to witness by plaintiffs, and were delivered up to Camp, who informed him that he took them by a precept of the Court. Here the plaintiffs rested their cause, and the defendant offered in evidence the execution before referred to, which is in the words following:

"THE TERRITORY OF FLORIDA,

*To all and singular the Marshals of said Territory*—GREETING:

We command you that of the goods and chattels, slaves, lands and tenements of Samuel Parkhill, deceased, in the hands of Martha Ann Manly late Parkhill, and Hiram Manly in right of his wife said Martha Ann, administrators of Samuel Parkhill deceased, remaining to be administered, you cause to be made the sum of ninety four thousand one hundred and eighty two dollars and twenty-two cents its debt and also twenty-seven thousand nine hundred and eighty-two dollars and sixty-five cents its interest and damages, making together, the sum of one hundred and twenty-two thousand, one hun-

dred and sixty four dollars and eighty seven cents, which the Union Bank of Florida, lately on the first day of March, 1845, recovered in our Superior Court for the County of Leon in the Middle District, as well for its debt as its damages, occasioned by the detention of said debt, and likewise the sum of seven dollars eighty-two cents, which to the said Union Bank of Florida, in the same Court adjudged for its costs by it in that behalf expended, together with lawful interest in said damages from the rendition of said judgment till paid, and the costs of this writ, and of your proceedings hereon, and that you have the said sums of money before the Judge of our said Court at Tallahassee, when satisfied to render the said Union Bank of Florida the sums aforesaid, and have then and there this writ. Witness, Richard T. Birchett, Clerk, &c."

Upon this writ, Camp endorsed his levy on the negroes alleged by the plaintiff to have been so tortiously taken. The introduction of this writ was objected to by the plaintiffs on the ground that they were strangers to it, and required the original entry and record of judgment to accompany it. The objection was sustained by the Court. Other executions were then offered in evidence, which were in the hands of Camp, the Marshal, at the time of the trespass complained of, and upon which like proceedings were had as on the one already set out. The pleadings and proceedings in these cases were the same, by consent of counsel.

Without intending to discuss all the errors assigned, we will simply take up those which we may deem decisive of the case.

First, therefore, was it requisite and necessary that the record of the judgment upon which the execution issued should have been produced by Camp ? Upon a review of the authorities, we are of opinion that the production of the writ merely was sufficient. There are several cases strongly in point as to this question, and we proceed to notice them, premising that they carry with them so high and cogent authority as to remove all doubt as to the correctness of our decision. There is a case in 5th Burrows, 2,631, which assumes the negative of this proposition, but we prefer being guided by the reason and authority of decisions to which our attention has been called, and which we now cite.

In Parsons *vs.* Loyd, 3 Wilson, R. 345, we find the law broadly laid down by Lord C. J. De Grey, who substantially remarks: Parsons the plaintiff was illegally imprisoned under color of a writ sued out against him, which is a *mere nullity*; he has been unlaw-

John G. Camp, *vs.* W. D. Moseley and others.

fully injured, and must have a remedy; but he has none against the officer, who is not to exercise his judgment touching the validity of the process in point of law; but is obliged to obey the command of the Courts of Westminster, or rather Superior Courts having general jurisdiction, and he may justify, under the writ, *although it be void*. But when the Courts has no jurisdiction of the cause, the whole is *coram non judice*. And he further says an action would lie against the *party* suing out such void writ. Citing 1 Levintz 95. 1 Siderfine 272. On page 376, in the same book (Wilson R.) it is further laid down by C. J. De Grey, that a Sheriff or his officer may justify themselves by pleading the *writ only*, because *that* is sufficient for their excuse, although there *be no judgment on record* to support or warrant such writ. But if a stranger interposes and sets the Sheriff to do an execution, he must take care to find a record that warrants the writ and must plead it. So must the party himself at whose suit an execution is made. No trespass is excused but what is inevitable.

Justice Peak in the case of Ives *vs.* Lucas and Thompson, 1 C. & P., 7, holds the following language: "As long as a judgment exists, it protects those who seize property under execution issued under it. And if the judgment is set aside no action lies against the Sheriff for anything done under it, while it remained in existence.— And he further said that the setting aside the judgment did not make the Sheriff's acts void by *relation*.

In Buller's *Nisi Prius*, pages 82 and 83, it is declared, that when the *subject matter* of the suit is within the jurisdiction of the Court, but the want of jurisdiction is as to the person or place, unless the want of jurisdiction appear on the process to the officer who executes it, he is not a trespasser; contrary, when the subject matter is not within its jurisdiction.

The same doctrine is held in Savacool *vs.* Boughton, 5 Wendell 170. Judge Marcy says: "Where the Court issuing the process has *general jurisdiction*, and the process is regular on its face, the *officer* is not, though the party may be affected by an irregularity in the proceedings. Where a judgment is vacated for an irregularity the party is liable for the acts done under it; but the officer has a protection of his regular writ." Citing 1 Lev. 95. 1 Sid. 272. 1 Strange, 509.

The case just cited was decided upon the following facts as set forth in the pleadings. The plaintiff declared in trespass for as-
25

sault, battery, and false imprisonment.    The defendant pleaded a justification, that he was a constable, by virtue of an execution issued by a Justice of the Peace, on a judgment rendered against the plaintiff, that he arrested the plaintiff and committed him to jail.    The plaintiff replied *precludi non* because previous to the rendition of the judgment set forth by the defendant, the Justice who rendered the same did not issue any process for the appearance of him, the plaintiff, in the suit in which judgment was rendered, that the judgment by confession was not entered by the Justice with authority of the plaintiff, nor did the parties in the suit *appear* before the Justice and join issue pursuant to the provisions of the $50 act.    To this replication the defendant demurred, and the plaintiff joined in the demurrer.

Here we see that no service of process was effected upon the party ; but because the Court, although one of limited jurisdiction, had jurisdiction of the subject matter, the officer who executed the process under the judgment, was held justified.    And the Court cites by way of sustaining its decision the very language hereinbefore set forth, as quoted from page 83 of Buller's *Nisi Prius.*

The case of Goft *vs.* Mitchell, 7 Blackford, 270, confirms this doctrine of holding the officer harmless, and extends it to a case where the Sheriff even *had notice* of the irregularity of the process.    The Court say :  " The writ was legal upon its face, and shewed jurisdiction in the Justice.    The law is that a writ having these characteristics, however irregularly issued even though there be no judgment on which to found it, is a justification to the officer acting under it.    Nor did the notice given to the defendant before he completed the execution of the writ, affect his authority.    He was not bound to look beyond his process.    Had he seen fit to assume the responsibility of judging for himself, whether the circumstances under which the writ issued would have excused him for not obeying it, he might have done so, and perhaps the excuse would have been sufficient.    But he was not bound to run the hazard."

There might be many other cases cited to shew the soundness of the proposition we have asserted ; but will conclude the citations after referring to 546 Comyns Digest, vol. 6, 5th American ed. : " If the defendant justifies by judicial process out of a Superior Court it is sufficient to allege the judgment, writ of *ca. sa.* and warrant thereon to the officer.    And the officer himself need not *allege the judgment,* only the writ and warrant."   3 Lev. 20.   1 Salk. 409.—

See also 10 John., 138. 10 Coke, 76, case of the Marshalsea, 10 Peters U. S. Rep., 476. 6 Peters, 17. 1 Levintz 95. Ib. 173.

From these authorities it would seem there is a distinction taken as to the protection afforded a party and the officer executing the process of the Court, the one being supposed to act in accordance with his volition and consequently amenable for acts done voluntarily, the other from a coercion arising from, and incident to the mandate of the writ or process directed to him. The Sheriff is a ministerial officer, and no action should lie against him merely in discharge of his duty, unless he exceed that duty when he becomes liable as a party. He is protected in the execution of process emanating from a Court of general jurisdiction, provided there appears on the face of the process that the Court has jurisdiction of the *subject matter* (5 Wendell 170,) nor was it for Camp to decide whether the judgment rendered against Manly and wife, administrators, was erroneous or void, regular or irregular. The judicial power of a Sheriff in this country is still less than in England, and his duty is obedience to the process of the Court.

This principle is illustrated in 6 Harrison and Johnson 301. The action was trespass against the Sheriff. Property was attached by him, under writs from the creditors of M. No person appeared to defend the suit, the property was condemned, *fieri facias* issued and sale. R. had notice of the service of the attachment, and at the *time of service* had notified the Sheriff of his claim to the property attached, and brought his action of trespass against the Sheriff. The Court held that the Sheriff was not responsible for a *tort* which as a public officer he is bound to perform—that he acted in obedience to the mandate of the law, and it would be strange if the law whose mandate he obeyed should make him responsible for such obedience—that the party in this case had notice of the attachment and had a right to appear in Court, and move to quash it. Indeed so far is this doctrine of protection to the officer carried that in 1 Levintz 95, we find that even after *judgment vacated*, the officer is excused for executing the writ, and in 3 Cranch 300, it is laid down by Judge Marshal that a judgment obtained *by fraud* will protect the officer for acts done under it, though not the parties.

It must be conceded we think that the writ in this case was legal on its face, shewing jurisdiction of the Court as to the subject matter of the suit, issued from a Court of general jurisdiction at a proper time and returnable in accordance with law, and it would be

going too far to adjudge that the Sheriff should be held responsible for any error of the Court, which rendered the judgment under which execution issued. Nor can we well perceive how the Sheriff was a *party* to the proceedings had in the Court, in the case of the Union Bank and the administrators of Parkhill. It is true that a Bill in Chancery is introduced in the bill of exceptions, in which bill Camp is one of the defendants, but there is no evidence that Camp had legal notice of the filing of the bill for an injunction. And supposing he had and the injunction was refused, could he not with propriety have taken the action of the Court as his guide and regarded it *pro tanto* as another judicial decision, as to the regularity and legality of the judgment rendered against the administrators of Parkhill. So too with the order of the Court, that the property of the estate of Parkhill be taken possession of by Camp, and that the letters of administration granted to Martha Manly be revoked. All this took place before the judgment rendered against Manly and Wife as general administrators, and though Camp may have had notice, still it would be inequitable and impolitic to have required Camp to look behind the judgment, and to hold him responsible for what was the error of the Court. These proceedings too were collaterally drawn in question in the Court below, and in the case of Tolmer *vs.* Thompson, 2 Peters 163, the Court say : That proceedings brought before a Court collaterally, " are by no means subject to all the exceptions which might be taken on a direct appeal. They well may be considered judicial proceedings; they were commenced in a Court of justice, carried on under the supervising power of the Court, and to receive its final ratification. The general and well settled rule of law in such cases is, that when the proceedings are collaterally drawn in question and it appears on the face of them, that the *subject matter* was within the jurisdiction of the Court they are voidable only. The errors and irregularities if any exist, are to be corrected by some direct proceedings either before the same Court to set them aside, or in an appellate Court. If there is a *total want* of jurisdiction, the proceedings are void and a mere nullity, and confer no right and afford no justification, and may be rejected when collaterally drawn in question."

In Voorhees *vs.* the Bank of the United States, 10 Pet. 474; the Court say : " If the validity of a sale under its process, can be questioned for any irregularity *preceding* the judgment, the Court which assumes such power places itself in the position of that which ren-

John G. Camp, vs. W. D. Moseley and others.

dered it, and deprives it of all power of regulating its own practice or modes of proceedings in the progress of a cause to judgment."

The next question arising for the consideration of the Court is, should the plaintiff in the Court below have been estopped from a recovery against Camp, owing to the admissions and conduct of Moseley one of the parties. It is not the intention of the Court to go any length into the doctrine of *estoppel in pais,* which has been so ably and learnedly argued in this and another case at bar during the term, but simply to advert to some of its general principles. We find while other classes of estoppels have not received much or great favor from the Courts those *in pais* have been much extended and received a liberal, enlarged and we might add an enlightened construction. The technicalities incident to estoppels are gradually giving way to considerations of reason and practical utility, and the Courts of the present day seem disposed to give force and efficacy to a doctrine which is based upon principles of justice and the purest morality.

In the case of the Welland Canal Company *vs.* Hathaway, 8 Wendell, 483, Judge Nelson remarks that the acts and admissions of a party operate against him in the nature of estoppel " when in good conscience and honest dealing he ought not to be permitted to gainsay them." In Stevens *vs.* Baird, 9 Cowen, 274, the constable had an execution against Benedict, and Stephens pointed out to the officer a quantity of lumber, one-fifth of which he said belonged to Benedict. . On the levy being made, a receipt for the property was made by Stephens, which was afterwards sold under the execution, Baird becoming the purchaser, Stephens standing by at the sale and giving no notice of his claim to the whole property. In a suit between Stephens and a purchaser it was held that Stephens was estopped from denying that Benedict owned one-fifth part of the lumber.

In Gregg *vs.* Wells, (10 Ad. and Ellis, 90,) it was held that if the owner of the goods stand by and voluntarily allow another to treat them as his own by which means a third person is induced to purchase them *bona fide* the former cannot recover them from the purchaser. Lord Denman said in this case : " A party who *negligently* or culpably stands by and allows another to contract on the faith and understanding of a fact which he can contradict, cannot afterwards dispute that fact in an action against the person whom he has assisted in deceiving." "The party is only concluded against shewing the truth, or asserting his legal rights when that would

have the effect of doing a wrong through his means to some third person." Hill Rep., 225.

Admissions arising from demeanor and conduct are conclusive against the party, where he has received a benefit therefrom or prejudiced another.  2 Saunders Pl. and Ev., 55.  Mr. Starkie in his work on Evidence, vol. 2, 37, uses this language :  " In general admissions may be presumed not only from the declarations of a party, but even from his acquiescence or silence, as for instance, when the existence of a debt or a particular right has been asserted in the presence of a party, and he has not contradicted it, such acquiescence and silence will amount *prima facie* to an admission of a debt or right.  So an acquiescence and endurance where acts are done by another which if wrongfully done are encroachments and call for resistance and opposition, are evidence of a tacit admission that such acts could not be legally resisted."

Now what has been the conduct of Moseley in relation to the alleged trespass of Camp.  The evidence shews that when he, Camp, proceeded to make the levy under the execution, a list of the negroes was furnished him by Moseley.  There was no denial on his part as to the right of Camp to levy.  There was indeed more than mere " acquiescence or silence," the furnishing the list was an affirmative act, and not merely negative—*it enabled, Camp to carry out the levy* in thus virtually designating the slaves to be levied upon.  He stands negligently by and there is a degree of negligence amounting to culpability, and allows the Marshal to make the levy, so far as appears by the testimony without protest or dissent.

It is not contended that the conduct of Moseley was fraudulent or wilfully intended to deceive Camp ; but still we must in accordance with the principles laid down, ask if it was such as to produce erroneous impressions on the mind of Camp, as to his future movements in relation to the levy.   There is no claim put in for the negroes by virtue of our statutes, and at the sale Moseley took an active part, assisting the Marshal, and made no dissent to the sale ; but advised people to bid, and when the sale was forbade by Archer he disapprobated the act, and it appears too that the Marshal acted in accordance with the views of Moseley as to the details of the sale.   Taking his whole conduct together, his acts, admissions, and declarations at the sale, it is very evident they are clearly inconsistent and at variance with the claims he now asserts.   It is true the

levy was the trespass if any was committed, and no claim was as serted at the time ; but there is direct connivance—the possession of the negroes by Camp was a continuing trespass and acquiesced in by Moseley. Ought he not now to be estopped from gainsaying his admissions, and when too he stood negligently by and allowed a person to do an act which he might not have done had he received any indication that he would be held legally responsible for that act ? We think he should be, and that Camp should not be amenable as a trespasser.

The effect ot an estoppel, whether legal or equitable, is the exclusion of evidence, and its existence must always be a question of law for the Court, and not of fact for the jury. 2 Smith's Leading Cases, 469, citing Lewis *vs.* Carstair, 5 Watts and Sergeant, 209, and we therefore think the Court erred in leaving the admissions of Moseley to the jury.

It is contended that even allowing the admissions of Moseley they cannot affect the rights of his co-administrator and administratrix. But if there are several administrators they are regarded in the light of an individual person. " They have a joint and entire interest in the effects of the intestate, which is incapable of being divided, and in case of death such interest shall vest in the survivor without any new grant from the Court." 1 Williams on Executors, 591. Acts done by one of several executors or administrators relating to the delivery, sale, or release of the testator's or intestate's goods are the acts of all. Wheeler *vs.* Wheeler, 9 Cowen, 34.— So two of three executors or administrators may compromise a claim and release a debtor to the estate without the concurrence and contrary to the express wish of the other. Murray *vs.* Blatchford, 1 Wendell, 583. There was formerly a distinction as to the acts and powers of administrators and executors, on the ground that the executor derived his authority from the act of the deceased, while the administrator derived his from the Ordinary, his appointment being considered in the light of an office. But, these distinctions have been overruled, and now joint administrators stand upon the same footing as executors, 407 Toller on Ex. 1 McCord, 492.— We deem it unnecessary to proceed further in the consideration of the case either as to the instructions given or those refused, being satisfied that the judgment of the Court below should be reversed.